UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLARD WORKMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NAMASTE TECHNOLOGIES INC., SEAN DOLLINGER, PHILIP VAN DEN BERG and KENNETH NGO,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Janita Holgate, Linda M. Rich (individually and on behalf of the Linda M. Rich Trust UA Aug. 29, 1997), and Minako Caddeo ("Lead Plaintiffs") and plaintiff Willard Workman (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, filings with Canadian regulatory authorities, wire and press releases published by and regarding Namaste Technologies Inc. ("Namaste" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Namaste securities between November 29, 2017 and March 6, 2019, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Namaste is a small, microcap company in the cannabis-related market, selling vaporizers and other accessories through various e-commerce websites. The Company is also involved in product design and manufacturing activities; and distribution of medical cannabis products.

3. A closer look into Namaste's world reveals a company, led by Sean Dollinger ("Dollinger"), its former Chief Executive Officer, plagued by unethical and illegal conduct which has admittedly gotten the Company in trouble.

4. For example, in an attempt to manipulate the stock price, the Company encouraged shareholders to accept a 90-day pledge to hold or increase their position in Namaste shares for a period of 90 days. Those shareholders who accepted and complied were rewarded by being invited to a promotional evening party thrown by Namaste, featuring Snoop Dogg, held in September 2018.

5. The Company also engaged in tax evasion by intentionally declaring Namaste shipments incorrectly in an effort to evade Value Added Taxes.

6. Additionally, the Company, whose shares trade over-the-counter and are not listed on any U.S. exchange, made a false claim about a NASDAQ up-listing in an effort to attract investors.

7. This is Namaste's corporate culture. But there is more!

8. On November 28, 2017, Namaste announced that it had signed a stock purchase agreement with ESC Hughes Holdings Limited to sell its wholly-owned subsidiary, Dollinger Enterprises US Inc. ("Dollinger US"), for $400,000 (the "Dollinger US Transaction").

9. The following day, a conference call was held, led by Dollinger, to discuss and answer questions regarding the announced deal. During the November 29, 2017 conference call, Dollinger told investors that the Dollinger US Transaction was at arm's length for fair market value, and the buyers were from Europe. None of that was true.

10. In fact, throughout the Class Period, Defendants made a number of materially false and misleading statements regarding the Dollinger US Transaction by either affirmatively mispresenting that the transaction was at arm's length, or failing to disclose that it was not an arm's length and that the Company agreed to sell Dollinger US to two Namaste executives in a related party transaction for less than fair market value.

11. On September 25, 2018, near the end of the Company's 2018 fiscal year and prior to the publication of the October 4, 2018 Citron Report that disclosed the related-party transaction, Namaste announced that it asked its auditor, MNP LLP, to resign on September 14, 2018 and hired PricewaterhouseCoopers LLP ("PwC") to replace its auditor. This was shortly after the Company announced on August 7, 2018 that it changed the Company's fiscal year end from August 31 to November 30 by extending the 2018 fiscal year to 15 months. The changing of its auditor towards the end of the 2018 fiscal year, coupled with the extension of the 2018

fiscal year, was a red flag to investors that something was amiss with respect to the Company's financial statements for the 2018 fiscal year.

12. On this news, shares of Namaste fell $0.47 per share or 16.26% to close at $2.42 per share on September 25, 2018.

13. On October 4, 2018, Citron Research ("Citron") published a bombshell report entitled "Namaste: Citron has exposed complete FRAUD that underpins the 'Business' of Namaste," (the "Citron Report"). The Citron Report disclosed that Dollinger, who is described as a "walking securities violation," had falsely represented to investors that Namaste sold Dollinger US to an "arm's length" purchaser, when the sale was actually an undisclosed related party sale to Namaste insiders – David Hughes, Namaste's Chief Marketing Officer, and Paul Burns, Namaste's Head of Human Resources.

14. Following publication of the Citron Report, Namaste's stock price fell $0.19 per share, or roughly 10.5% over the next two trading days, to close at $1.62 per share on October 5, 2018.

15. The Company initially denied that the Dollinger US Transaction was an undisclosed related party transaction, but on February 4, 2019, Namaste came clean and issued a press release disclosing that, following an internal investigation, the Board terminated Dollinger's employment as CEO for cause, and removed him from his position as Director, effective immediately. The press release further stated that the allegation in the Citron Report that the sale of Namaste's U.S. subsidiary Dollinger US was an undisclosed related-party transaction was substantiated, and that there were subsequent transactions involving Dollinger US' assets and companies in which Dollinger and Hughes had a beneficial interest.

16. On this news, shares of Namaste fell another $0.14 per share or 13.46% to close at $0.90 per share on February 4, 2019.

17. On March 5, 2019, Namaste filed a Notice of Change of Auditors with the Canadian securities regulatory authorities that stated that PwC resigned as auditor of the Company, on its own initiative, effective February 19, 2019. The notice further stated that PwC did not complete the audit for the 2018 fiscal year, which would have reported on the Dollinger US Transaction and any other improprieties that affected the Company's financial statements. The Company's audited financial statements for the 2018 fiscal year are required to be filed by April 1, 2019.

18. On this news, shares of Namaste fell approximately $0.16 over a two-day trading period, or approximately 22% to close at $0.56 on March 6, 2019.

19. Prior to the Company's announcement on February 4, 2019 that Dollinger was fired and that Citron's allegation that the Dollinger US Transaction was an undisclosed related party transaction was true, Sefi Dollinger, the Chairman of the Board and uncle to Defendant Dollinger, sold 10,000 Namaste common shares on January 28, 2019 that he held directly. On March 7, 2019, the Company announced that both Sefi Dollinger and Kiran Sidhu, another Director, resigned from the Board. The Board is now comprised of three people, including Defendant Ngo.

20. On this news, shares of Namaste fell $0.03 per share or approximately 5.5% to close at $0.53 per share on March 7, 2019.

21. On March 18, 2019, the Company announced in a press release that it will not be in a position to file its audited annual financial statements for the 2018 fiscal year by the filing deadline of April 1, 2019.

22. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26. In connection with the acts, conduct and other wrongs alleged in this amended complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

27. Lead Plaintiff Janita Holgate ("Holgate") purchased Namaste common stock during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Holgate's trades in Namaste common stock were executed in the U.S. Holgate resides in the U.S. and purchased stock in the Company in U.S. dollars ("USD"), through her account with a broker who is located in the U.S., and traded within the security's daily prices ranges throughout the Class Period. Holgate also purchased Namaste common stock utilizing market makers located in the U.S.

28. Lead Plaintiff Linda M. Rich ("Rich") purchased Namaste common stock during the Class Period on behalf of herself and as Trustee of the Linda M Rich Trust UA Aug. 29, 1997, and was damaged upon the revelation of the alleged corrective disclosures. Rich's trades in Namaste common stock were executed in the U.S. Rich resides in the U.S. and purchased stock in the Company in USD, through her accounts with brokers who are located in the U.S., and traded within the security's daily prices ranges throughout the Class Period.

29. Lead Plaintiff Minako Caddeo ("Caddeo") purchased Namaste common stock during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Caddeo's trades in Namaste common stock were executed in the U.S. Caddeo resides in the U.S. and purchased stock in the Company in USD, through her account with a broker who is located in the U.S., and traded within the security's daily prices ranges throughout the Class Period.

30. Plaintiff Willard Workman ("Workman") purchased Namaste common stock during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Workman's trades in Namaste common stock were executed in the U.S. Workman resides in the U.S. and purchased stock in the Company in USD, through his account with a broker who is located in the U.S., and traded within the security's daily prices ranges throughout the Class Period.

31. Defendant Namaste operates as a cannabis e-commerce company with various e-commerce sites. Namaste is incorporated and has its principal executive offices in Canada. Namaste's common stock trades on the over-the-counter ("OTC") market in the United States under the ticker symbol "NXTTF."

32. Defendant Sean Dollinger ("Dollinger") served as the Company's co-founder, Chief Executive Officer ("CEO"), and Director during the Class Period. While the internal investigation was ongoing, Dollinger sold 2.357 million Namaste common shares on December 20, 2018 that he held directly or indirectly for a $2.056 million profit, which he reported on December 28, 2018, a week after making the sales. The sale of Dollinger's shares appears to have been under pressure, with all of the shares sold in a single day after the price of the stock collapsed. This sent the stock into a 52-week low.

33. Defendant Philip van den Berg ("van den Berg") served as the Company's Chief Financial Officer ("CFO"), Corporate Secretary and Director from October 18, 2016 until June 2018.

34. Defendant Kenneth Ngo ("Ngo") served as the Company's CFO since June 2018 and became a Director in December 2018. Ngo served as the Company's Corporate Controller from April 2018 until June 2018.

35. The Defendants referenced above in ¶¶ 32-34 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

36. Namaste, through its subsidiaries, operates as a cannabis e-commerce company. The company retails vaporizers and smoking accessories through e-commerce sites and is also involved in product design and manufacturing activities; and distribution of medical cannabis products.

37. Defendant Dollinger, the highest-ranking executive in the Company, made all day-to-day decisions of the Company, managed the overall operations and resources of the

Company, acted as the main point of communication between the board of directors and operations, and was the public face of the Company.

38. Dollinger worked very closely with David Hughes who was based in Ireland, served as Namaste's Chief Marketing Officer, and was known within the Company as "David Ireland." Hughes was considered to be key management and essential to carrying out the work of the Company.

39. According to Namaste's former Chief Operating Officer ("COO") from April 2017 to October 2017 ("CW1"), the relationship between Hughes and Dollinger was so strong that it rendered other C-level executives, like CW1, relatively impotent. CW1, who was responsible for the Company's entire manufacturing, transport and distribution system, stated: "I may have been COO, but it was like I was number 12 because of Hughes's and Sean[ ] [Dollinger's] relationship."

40. CW1 also stated that Dollinger "was such a micromanager – he tried to have control over everything." Based on CW1's own interactions and communications with Dollinger, Dollinger was aware of all the moves his company made and he dictated most of them.

41. A former Namaste Operations Manager from October 2016 until sometime between January and April 2018 ("CW2"), stated that "Hughes was a big part of Namaste." CW2 handled operations, including customer service and distribution for the VaporSeller.com side of the business. "Anytime I had to . . . do paperwork or requests for inventory, [] Hughes played a big part of that." "He was a big part of the shares as well – he was the guy that came in to explain [things] to shareholders." CW2 stated that Dollinger and Hughes were very close.

## Namaste Created A Corporate Culture Of Evading Taxes And Other Unethical Conduct

**Namaste Engaged in Tax Evasion**

42. Not long after arriving at Namaste in April 2017, CW1 became uncomfortable with the way that Dollinger and Hughes were operating the Company. For example, CW1 discovered that Dollinger and Hughes were intentionally declaring Namaste shipments incorrectly in an effort to evade Value Added Taxes ("VAT"). CW1 stated that "[i]f you have a $200,000 shipment, but declare it as $20,000 or $50,000, your VAT is way less." CW1 was troubled by directives he received from Dollinger and Hughes to "declare things incorrectly" which was consistent with tax evasion. He became increasingly alarmed because "what was going on was falling under my responsibility." "I didn't want to get dinged – it's a big deal in the UK – and it caused a huge riff between me and Sean [Dollinger] and Dave [Hughes]." "I like to maintain an ethical compass, and they were not meeting my standards."

**Namaste Sells Knock-Off Vape Products**

43. CW1 also stated that Namaste procured and sold fake or knock-off vape products. "The company I came from was in arrears because of [Namaste's] participation in fake vapes." CW1 explained that the industry was experiencing a rash of intellectual property theft, with manufacturers producing knock-off versions of popular products and shady vendors selling them as the original. CW1 stated that the fake-vape activity was attributed to a few bad actors and Dollinger figured heavily in the problem.

**The 90-Day Pledge, The Pledge Party, And The Subsequent Investigation By Canada's Ministry Of Health And Social Services**

44. Then there was the "90-day pledge" whereby Namaste shareholders who agreed to hold or increase their position in Namaste shares for a period of 90 days would be rewarded by

being invited to a promotional evening party thrown by Namaste to be held in September 2018 after the conclusion of the 90-day period (the "Pledge Party"). The pledge began on May 14, 2018 and the Company continued to accept pledge agreements until May 18, 2018. The pledge was never put out in an official press release but was organized and promoted by the Company. According to Citron Research's September 13, 2018 report on Namaste, this attempt to support the stock price "is at best severely unethical and at worst manipulative."

45. On September 12, 2018, the Company held the Pledge Party in Montreal, Quebec, an exclusive, invite-only event for over 500 shareholders who agreed to the 90-day pledge. At the party, rapper Snoop Dogg performed, and women dressed in sexy nurse uniforms were recruiting cannabis customers by completing online forms on Namaste's app so that clients could obtain medical cannabis orders from a Skype "telemedicine" interview with an Ontario nurse practitioner. Other women in underwear coated with body painting were promoting a subcutaneous cannabis injector to consume marijuana oil by injection. This product was not officially approved in Canada. Additionally, cannabis sprays, grinders and rolling papers with the image of a home pot delivery company were distributed at the party in violation of several sections of the Quebec and Canadian laws that formally prohibit the promotion of recreational cannabis products.

46. For example, Canada's Cannabis Act's section on promotion outlines the limits on promotion: "It is prohibited to promote cannabis or a cannabis accessory or any service related to cannabis, including . . . by communicating information about its price or distribution; . . . or by presenting it or any of its brand elements in a manner that associates it or the brand element with, or evokes a positive or negative emotion about or image of, a way or life such as

one that includes glamour, recreation, excitement, vitality, risk or daring." Cannabis Act, 2 (A)(17)(1) (2018).

47. The Pledge Party prompted a response from the Quebec government, as the Quebec Cannabis Society ("SQDC") became the sole provider of recreational cannabis as of October 17, 2018 and upholds compliance in the marketplace. While nurses are not legally permitted to provide cannabis prescriptions in Quebec, Ontario nurse practitioners provided the cannabis prescriptions to Namaste party guests in Montreal, Quebec. According to a September 14, 2018 article in Canada's *La Presse*, the Pledge Party was an obvious attempt to circumvent the SQDC's state-owned cannabis sales monopoly by recruiting customers and providing convenient medical cannabis prescriptions.

48. As a result of the party, the SQDC put pressure on cannabis grower Tilray, which supplies 5,000 kilogram of cannabis a year to the state-owned company, but was also a new supplier to Namaste. In September 2018, Namaste and Tilray signed a purchase agreement under which Namaste would purchase bulk cannabis from Tilray to sell on its wholly-owned subsidiary, CannMart's, e-commerce platform. Cannmart Inc. is a licensed cannabis producer under the Access to Cannabis for Medical Purposes Regulations.

49. Linda Bouchard, spokesperson for the SQDC, stated that "[a] producer who does business with us cannot be associated with a company that is against the law." Consequently, on September 17, 2018, Tilray cut ties with Namaste because of the Pledge Party.

50. On September 14, 2018, *La Presse* reported that an investigation by Canada's Ministry of Health and Social Services was also triggered on September 13, 2018 because Namaste's business practices appeared to deviate from the spirit of the cannabis laws passed by Quebec and Ottawa in the summer of 2018.

51. As reported by the Financial Post on October 4, 2018, Namaste's CEO acknowledged: "Obviously, even though it was a private party, we still got into a lot of trouble."

**To Attract Investors, Namaste Makes A False Claim of A NASDAQ Listing**

52. On July 23, 2018, during the 90-day pledge period, Namaste issued a press release announcing its *submission of its application* to list its common shares on the NASDAQ Capital Market.

53. Much of the chatter on the street was about whether there would be share consolidation by the Company in order for it to qualify for the NASDAQ, which only lists companies that trade over $2, $3, or $4, depending on whether they meet other requirements. A share consolidation occurs when a company decreases the number of shares it has on issue which causes the share price to increase proportionally.

54. Every Wednesday, at 4:00 pm EST, it was time for "Namaste 420," an internet livestream show. On Wednesday, July 25, 2018, Dollinger phoned in and stated that Namaste had been *accepted to list* on the NASDAQ: "Let's talk about our accomplishment of being *accepted to one of the largest stock exchanges in the world*. And not only entering on the lowest tier, we've been *accepted to the second tier*. . . . I said 'leave it to me, to get us approved on the NASDAQ,' that I believe in the lawyers, the legal team and our advisors that we will get approved. And that's what I did." (Emphasis added.)

55. However, Dollinger's statement was nothing more than a false claim to attract investors. Namaste was never up-listed to the NASDAQ.

**Namaste Divests Dollinger Enterprises US Inc. In A**
**2017 Undisclosed Related-Party Transaction**

56. In addition to all of the foregoing illegal and unethical conduct rampant at the Company, Namaste also engaged in an undisclosed related-party sale of the Company's U.S. assets – its wholly-owned U.S. subsidiary, Dollinger US.

57. Namaste's principal business includes e-commerce and Dollinger US was the Company's global e-commerce business that sells similar products in various geographic areas. According to the Company's Management Discussion and Analysis ("MD&A") for the three and twelve months ended August 31, 2018, Dollinger US was one of Namaste's six operating segments within the Company that was monitored by the chief operating decision makers throughout the year.

58. On November 28, 2017, Namaste issued a press release announcing the Dollinger US Transaction. The press release stated that the Company had signed a stock purchase agreement with ESC Hughes Holdings Limited ("ESC") to sell Dollinger US for $400,000.

59. The following day, a conference call was held, led by Dollinger, to discuss and answer questions regarding the announced deal. During the November 29, 2017 conference call, Dollinger told investors that the Dollinger US Transaction was at arm's length for fair market value, and the buyers were from Europe.

60. On December 31, 2017, the Company completed the sale of Dollinger US to ESC.

61. On October 4, 2018, Citron dropped issued a bombshell report that disclosed to the market that Namaste sold Dollinger US to ESC in a 2017 undisclosed related-party transaction. The report stated that ESC was led by Hughes, Namaste's Chief Marketing Officer, and Namaste's Head of Human Resources, Paul Burns ("Burns"). The report also asserted that

Namaste claimed to have sold Dollinger US to hide its U.S. assets, a necessary move to trade on a U.S. exchange.

62. Namaste is a Canadian public company. Under International Accounting Standards (IAS 24), Canadian public companies are required to disclose related party transactions.

63. According to CW2, around December 2017, Namaste employees were specifically instructed to "play it nonchalant" that Dollinger and Hughes knew each other. CW2 stated that the sale seemed to occur very suddenly, remained hush-hush pending finalization of a few details, and did not undergo a thorough due diligence process.

64. Additionally, Dollinger US was sold well below fair market value. CW1 stated that while he was collecting his closeout package around October 2017, he had access to documents regarding the sale of Dollinger US to ESC. According to CW1, Dollinger US had $1.5-$2.0 million in merchandise on hand in Florida warehouses when the deal was struck. According to CW1, "[f]rom what I saw, I doubt the sale was made properly." Similarly, CW2 stated that the deal to sell Dollinger US was not made at an appropriate price point for its value.

65. The Company issued a press release on October 9, 2018 in response to the Citron Report that stated, in relevant part, that "the Company's sale of its US assets was not to a 'related party' and was not a 'related party transaction'. . . ."

66. Notwithstanding this flat-out denial to the market, Namaste's Board of Directors formed a Special Committee to investigate the allegations in the Citron Report. The Special Committee was comprised of two independent Directors, Branden Spikes and Laurens Feenstra. Miller Thomson LLP ("Miller Thomson") was engaged as legal advisor to the Special

Committee and Miller Thomson retained Ernst &Young LLP to conduct a detailed investigation and report back to the Special Committee.

67. While the investigation was ongoing, on January 11, 2019, Namaste announced a new employment agreement between Dollinger and Namaste, effective January 1, 2019, which provided a base compensation of $300,000 per year, the issuance of stock options to acquire a total of 500,000 common share stock options of the Company, and additional bonus provisions for up to 1.5x the annual salary amount.

68. Less than 30 days later, on February 4, 2019, Namaste issued a press release stating that, following an internal investigation, the Board terminated Dollinger's employment as CEO for cause, and removed him from his position as Director, effective immediately. ***The press release further stated that the allegation in the Citron Report that the sale of Namaste's U.S. subsidiary Dollinger US was a related-party transaction was substantiated, and that there were subsequent transactions involving Dollinger US' assets and companies in which Dollinger and Hughes had a beneficial interest***.

69. The Company announced a settlement with Dollinger on February 19, 2019 and that as part of that agreement, Dollinger agreed to withdraw his previously announced legal application against the Company and to step down from all formal roles with the Company.

**Materially False And Misleading Statements Issued**
**<u>During The Class Period (November 29, 2017 Through March 6, 2019)</u>**

70. The Individual Defendants possessed the power and authority to, and did, control the contents of the Company's filings with the Canadian securities regulatory authorities, press releases and presentations to institutional investors, securities analysts, and portfolio managers. The Individual Defendants were provided with copies of the Company's filings with the Canadian securities regulatory authorities and press releases alleged herein to be materially false

and misleading prior to, or shortly thereafter, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Company and the Individual Defendants are liable for the false statements and omissions pleaded herein.

Statements Made During Q1 2018 (September 1, 2017-November 30, 2017)

71. Namaste issued an after-market-close press release on November 28, 2017 entitled, "Namaste Divests US Assets to Focus on Legal Cannabis Markets and Announces Conference Call," announcing that it had signed a stock purchase agreement to sell its wholly-owned U.S. subsidiary, Dollinger US. The press release stated, in relevant part:

> Vancouver, British Columbia, Canada - ***Namaste Technologies Inc. ("Namaste" or the "Company") (CSE:N) (OTC:NXTTF) (FRANKFURT:M5BQ) is pleased to announce that it has signed a stock purchase agreement (the "Agreement") with ESC Hughes Holdings Limited ("ESC") to sell the Company's wholly owned US subsidiary, Dollinger Enterprises US Inc. ("Dollinger US").*** The Agreement includes the sale of the domain names Everyonedoesit.com and NamasteVapes.com which combined represent less than 7% of Namaste's current gross revenue, both of which are currently operating at a net loss. Due to the political uncertainty surrounding the legalization of cannabis in the US, Namaste's management has deemed it appropriate to shift its focus to legal cannabis markets and management believes that the Company will be better aligned with its long-term interests by divesting its US operations. Management also feels it is prudent to divest these assets in preparation for the legalization of both medical and recreational marijuana in Canada. This decision better aligns Namaste with many of its Canadian counterparts and will enable the Company to capitalize on more accretive opportunities moving forward.
>
> ***Under the terms of the Agreement, Namaste will, through its wholly owned subsidiary, Namaste Technologies Holdings Inc., in consideration of a cash purchase price of US $400,000, convey to ESC the following:***
>
> - ***All authorized and issued shares of Dollinger US***

- ***NamasteVapes.com and Everyonedoesit.com domains***
- ***All banking, merchant, and services accounts***
- ***Five employees of Dollinger US***
- ***One real estate lease held under Dollinger US***

> Payment of US $100,000 will be received on closing, with the balance of the purchase price being paid at a monthly rate of US $25,000 until paid in full, with payments commencing on January 1, 2018. Closing is expected to occur on or about December 4, 2017.

72. The following day, November 29, 2017, Namaste held a conference call to "discuss and answer questions regarding [the news about the Dollinger US Transaction]." During the call, Dollinger, who led the call, lied and stated that the transaction was at arm's-length (emphasis added):

> [Question:] and the buyers [of Dollinger US] are arm's length, are they?
>
> [Dollinger]: ***Absolutely! It's a group out of Europe who's been interested and we don't feel they're a threat if we do need to re-enter into the U.S. So we needed to make sure, there were a lot of people who were interested, due to the names of the websites, etc., so we did have to make a strategic decision on who we sold to."***

73. Dollinger also stated: "By selling our US arm, ***not only will we be selling it at a fair market value***, which will give our company positive cash flow for the next twelve months, but the removal of the division will allow us to become profitable by the summer of 2018."

74. The italicized statements set forth in ¶¶ 71-73 were materially false and/or misleading because Defendants either (i) affirmatively misrepresented that the Dollinger US Transaction was an arm's length transaction; or (ii) knew, but failed to disclose, that the Dollinger US Transaction was not an arm's length transaction and that the Company agreed to sell Dollinger US to its Chief Marketing Officer and Head of Human Resources in a related party transaction for less than fair market value.

Statements Made During Q2 2018 (December 1, 2017-February 28, 2018)

75. On January 8, 2018, Namaste filed its annual financial statements, MD&A and certification of annual filings for the fiscal year ended August 31, 2017 with the Canadian securities regulatory authorities. The annual financial statements were signed by Dollinger and van den Berg. The notes to the financial statements stated (emphasis added):

> 20. Subsequent events
>
> ***
>
> ***On November 28, 2017 the Company announced that it signed a stock purchase agreement with ESC Hughes Holdings Limited ("ECS") to sell the Company's wholly owned US subsidiary, Dollinger Enterprises US Inc. ("Dollinger US").*** The Agreement includes the sale of the domain names Everyonedoesit.com and NamasteVapes.com which combined represent less than 7% of Namaste's current gross revenue, both of which are currently operating at a net loss. ***Under the terms of the Agreement, Namaste will, through its wholly owned subsidiary, Namaste Technologies Holdings Inc., in consideration of a cash purchase price of US $400,000 convey to ESC all authorized and issued shares of Dollinger US, NamasteVapes.com and Everyonedoesit.com domains, all banking, merchant, and services accounts, five employees of Dollinger US and one real estate lease held under Dollinger US.***

76. The certification, signed by both Dollinger and van den Berg stated, in relevant part (emphasis in original, emphasis added):

> **Review**: I have reviewed the [Annual Information Form ("AIF")], if any, annual financial statements and annual MD&A including, for greater certainty, all documents and information that are incorporated by reference in the AIF . . . of Namaste . . . for the financial year ended August 31, 2017.
>
> ***No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings*.

77. On February 20, 2018, Namaste filed a short form prospectus with the Canadian securities regulatory authorities. The prospectus was signed by Defendants Dollinger and van

den Berg. The prospectus described the sale of Namaste's U.S. subsidiary, stating in relevant part:

> ***On December 31, 2017, the Company completed the sale of Dollinger Enterprises US Inc., a wholly-owned US subsidiary, to ESC Hughes Holdings Limited, for cash consideration of USD$400,000***. USD$100,000 was received on closing, with the balance of the purchase price to be paid in monthly instalments of USD$25,000. The sale represented the divestiture of the domains, everyonedoesit.com and namastevapes.com, which accounted for less than 7% of the Company's gross revenues and operated at a loss.

78. The italicized statements set forth in ¶¶ 75-77 were materially false and/or misleading because Defendants knew, but failed to disclose, that the Dollinger US Transaction was not an arm's length transaction and that the Company agreed to sell or sold Dollinger US to Namaste's Chief Marketing Officer and Head of Human Resources in a related party transaction for less than fair market value.

Statements Made During Q3 2018 (March 1, 2018-May 31, 2018)

79. On April 30, 2018, Namaste filed its quarterly financial statements, MD&A and certification of the quarterly filings for the interim period ended February 28, 2018 with the Canadian securities regulatory authorities. The notes to the financial statements stated (emphasis added): "Gain on disposal of Dollinger Enterprises US Inc. ***On December 31, 2017, the Company closed the sales of Dollinger Enterprises US Inc. to ESC Hughes Holding Limited ("the buyer"), an arm's length party.***"

80. The certifications, signed by both Dollinger and van den Berg, stated, in relevant part (emphasis in original, emphasis added):

> **Review**: I have reviewed the interim financial report and interim MD&A . . . of Namaste . . . for the interim period . . . .
>
> ***No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a*

> ***statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings***.

81. The italicized statements set forth in ¶¶ 79-80 were materially false and/or misleading because Defendants (i) affirmatively misrepresented that the Dollinger US Transaction was an arm's length transaction; or (ii) knew, but failed to disclose, that the Dollinger US Transaction was not an arm's length transaction and that the Company sold Dollinger US to its Chief Marketing Officer and Head of Human Resources in a related party transaction for less than fair market value.

Statements Made During Q4 2018 (June 1, 2018-November 30, 2018 (extended))

82. On July 23, 2018, Namaste filed its quarterly financial statements, MD&A and certification of the quarterly filings for the interim period ended May 31, 2018 with the Canadian securities regulatory authorities. The notes to the financial statements stated (emphasis added): "Gain on Sale of Dollinger Enterprises US Inc. ***On December 31, 2017, the Company closed the sales of Dollinger Enterprises US Inc. to ESC Hughes Holding Limited ("the buyer"), an arm's length party, for [CAD]$500,000.***"

83. The certifications, signed by both Dollinger and Ngo, stated the same language as set forth in ¶ 80 herein.

84. On October 9, 2018, after the Citron Report was published, Namaste issued a press release in response to the allegations in the report. The press release stated (emphasis added): "***that the Company's sale of its US assets was not a 'related party' and was not a 'related party transaction' as defined under applicable Canadian securities laws and that other assertions made by Citron are equally inaccurate and misleading.***"

85. On October 30, 2018, Namaste filed its quarterly financial statements, MD&A and certification of the quarterly filings for the interim period ended August 31, 2018 with the

Canadian securities regulatory authorities. The notes to the financial statements stated (emphasis added): "Gain on disposal of subsidiary. ***On December 31, 2017, Namaste Technologies Holdings Inc. (a wholly owned subsidiary) sold its 100% interest in Dollinger US to ESC Hughes Holding Limited for [CHD]$500,000 which resulted in a gain of [CHD]$265,345.***"

86. The certifications, signed by both Dollinger and Ngo, stated the same language as set forth in ¶ 80 herein.

87. The italicized statements set forth (or referred to) in ¶¶ 82-86 were materially false and/or misleading because Defendants (i) affirmatively misrepresented that Dollinger US Transaction was an arm's length transaction; (ii) affirmatively misrepresented that the Dollinger US Transaction was not a related party transaction; or (iii) knew, but failed to disclose, that the Dollinger US Transaction was not an arm's length transaction and that the Company sold Dollinger US to its Chief Marketing Officer and Head of Human Resources in a related party transaction for less than fair market value.

Statements Made During Q1 2019 (December 1, 2018-end of class period)

88. On December 28, 2018, Namaste issued a press release that stated:

> Namaste . . . is issuing this press release in response to a request by the Investment Industry Regulatory Organization of Canada to comment on recent trading activity of its common shares. ***The Company announces that it is not aware of any material undisclosed developments and has no material information or change to report at this time. Namaste is also unaware of any material undisclosed change related to the Company that would explain the recent movements in the price of its common shares***. The Company will keep the market informed as required.

89. The italicized statements set forth in ¶ 88 were materially false and/or misleading because Namaste failed to disclose that the Dollinger US Transaction was indeed an undisclosed related-party transaction.

**The Truth Begins To Emerge**

90. On September 25, 2018, near the end of the Company's 2018 fiscal year and prior to the publication of the Citron Report, Namaste announced that it asked its auditor, MNP LLP, to resign on September 14, 2018 and hired PwC to replace its auditor. This was shortly after the Company announced on August 7, 2018 that it changed the Company's fiscal year end from August 31 to November 30 by extending the 2018 fiscal year to 15 months. The changing of its auditor towards the end of the fiscal year, coupled with the extension of the 2018 fiscal year, was a red flag to investors that something was amiss with respect to the Company's financial statements for the 2018 fiscal year.

91. On this news, shares of Namaste fell $0.47 per share or 16.26% to close at $2.42 per share on September 25, 2018.

92. On October 4, 2018, Citron Report was published. The report stated, in relevant part, that the Company had entered into an undisclosed related party transaction (emphasis in original):

> With the hope of obtaining the NASDAQ listing on Nov 28, 2017, Namaste announced that it divested of its US assets, Dollinger Enterprises US Inc.
>
> > *"with our LP sales license knocking on our doorstep, Namaste management has decided that it would be best for our shareholders to divest the company of our US assets...With the US's federal government stance on marijuana and the current federal legislation in the US, Namaste management believes this is a strategic decision which will allow the company to explore new opportunities."* --- Sean Dollinger, Nov 28, 2017 Call
>
> Citron asks, "Who in the world would want to buy a money hemorrhaging online vape business from Namaste?"
>
> In a direct response to that simple question, Sean Dollinger replied:
>
> "[Question:] ***and the buyers are arm's length, are they?*** ***[Sean]:*** ***absolutely!*** *It's a group out of Europe*" Sean Dollinger, Nov 28, 2017 Call

> Namaste allegedly sold these assets for US$400k to ESC Hughes Holding Limited. The terms were $100k down and $25k a month….

93. The Citron Report disclosed, with proof, that the purchaser was not a third party, but rather Hughes, Namaste's Chief Marketing Officer and Burns, Namaste's Head of Human Resources. Hughes has been with Namaste since February 2015, and Burns has been with Namaste since 2016. "Namaste has lied to its shareholders, Canadian Regulators, US Regulators; and most of all has attempted to hide US assets from the Justice Department in an attempt to obtain a US listing." And with $2.6 million in inexplicable consulting fees, Citron believes that Namaste is paying out large sums of cash to undisclosed related parties. *See* the following document uploaded by Citron below for the proof.



2018 FLORIDA PROFIT CORPORATION ANNUAL REPORT

FILED
Mar 23, 2018
Secretary of State
CC9709825418

Entity Name: DOLLINGER ENTERPRISES US INC.

Current Principal Place of Business:

Current Mailing Address:
5155 CORPORATE WAY K
JUPITER, FL 33458

FEI Number: 81-1566025

Certificate of Status Desired: No

Name and Address of Current Registered Agent:

SIGNATURE: HOLIDAY HUNT RUSSELL 03/23/2018

Officer/Director Detail :

| | | | |
|---|---|---|---|
| Title | PRESIDENT, TREASURER | Title | VP, SECRETARY |
| Name | HUGHES, DAVID | Name | BURNS, PAUL |
| Address | 5155 CORPORATE WAY K | Address | 5155 CORPORATE WAY K |
| City-State-Zip | JUPITER FL 33458 | City-State-Zip | JUPITER FL 33458 |

Source: Citron Report

94. On this news, shares of Namaste fell $0.19 per share or nearly 10.5% over the next two trading days to close at $1.62 per share on October 5, 2018.

95. The Company issued a press release on October 9, 2018 in response to the Citron Report. The press release stated, in relevant part, "that the Company's sale of its US assets was not to a 'related party' and was not a 'related party transaction' . . . and that other assertions made by Citron are equally inaccurate and misleading."

96. On February 4, 2019, Namaste issued a press release stating that, following an internal investigation, the Board terminated Dollinger's employment as CEO for cause, and removed him from his position as Director, effective immediately. The press release further stated that the allegation in the Citron Report that the sale of Namaste's U.S. subsidiary Dollinger US was an undisclosed related-party transaction was substantiated, and that there were subsequent transactions involving Dollinger US' assets and companies in which Dollinger and Hughes had a beneficial interest. The press release stated, in relevant part (emphasis added):

> *[t]he only [material allegation] that was substantiated and required action, as recommended by the Special Committee, related to the sale of Namaste's US subsidiary Dollinger Enterprises US Inc., in 2017, and subsequent transactions involving its assets and companies in which Sean Dollinger and Namaste's head of marketing David Hughes have a beneficial interest*, as well as breaches of fiduciary duty by Sean Dollinger and evidence of self-dealing. In light of these findings and the Special Committee recommendations, the Board concluded that it is in the best interest of Namaste that Sean Dollinger be terminated from his role as CEO for cause and removed as Director of the Company. In connection with the findings of the investigation, the Company is commencing legal action against Sean Dollinger for damages and disgorgement.

97. On this news, shares of Namaste fell $0.14 per share or 13.46% to close at $0.90 per share on February 4, 2019.

98. On March 5, 2019, Namaste filed a Notice of Change of Auditors with the Canadian securities regulatory authorities that stated that PwC resigned as auditor of the Company, on its own initiative, effective February 19, 2019. The notice further stated that PwC did not complete the audit for the 2018 fiscal year, which would have reported on the Dollinger

US Transaction and any other improprieties by Defendant Dollinger. The Company's audited financial statements for the 2018 fiscal year are required to be filed by April 1, 2019.

99. On this news, shares of Namaste fell approximately $0.16 over a two-day trading period, or approximately 22% to close at $0.56 on March 6, 2019.

100. Prior to the Company's announcement on February 4, 2019 that Dollinger was fired and that Citron's allegation that the Dollinger US Transaction was an undisclosed related party transaction was true, Sefi Dollinger, the Chairman of the Board and uncle to Sean Dollinger, sold 10,000 Namaste common shares on January 28, 2019 that he held directly. On March 7, 2019, the Company announced that both Sefi Dollinger and Kiran Sidhu, another Director, resigned from the Board. The Board is now comprised of three people, including Defendant Ngo.

101. On this news, shares of Namaste fell $0.03 per share or approximately 5.5% to close at $0.53 per share on March 7, 2019.

102. On March 18, 2019, the Company announced in a press release that it will not be in a position to file its audited annual financial statements for the 2018 fiscal year by the filing deadline of April 1, 2019.

## ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER

103. The nature of the undisclosed related party transaction and the positions held by the Individual Defendants, in conjunction with the factual allegations concerning the Dollinger US Transaction, provide strong circumstantial evidence that the Individual Defendants, and by extension Namaste knowingly made the misrepresentations and omissions concerning the undisclosed related party transaction.

104. The alleged fraud relates to Namaste's core business during the time period in which the Individual Defendants and Hughes were at Namaste's helm. Moreover, during such time, Dollinger and Hughes had an extremely close relationship, as confirmed by CW1.

105. While the internal investigation was ongoing, Dollinger sold 2.357 million Namaste common shares on December 20, 2018 that he held directly or indirectly for a $2.056 million profit, which he reported on December 28, 2018, a week after making the sales. The sale of Dollinger's shares appears to have been under pressure, with all of the shares sold in a single day after the price of the stock collapsed. Dollinger's sale sent the stock into a 52-week low.

106. Namaste's corporate culture of tax evasion and other unethical conduct further supports Plaintiffs' allegations demonstrating falsity and scienter.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

107. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Namaste securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

108. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Namaste securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Namaste or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

109. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

110. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

111. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Namaste;
- whether the Individual Defendants caused Namaste to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Namaste securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

112. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

113. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Namaste securities were traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded OTC and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Namaste securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

114. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

115. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

116. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

117. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission.

118. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Namaste securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Namaste securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

119. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, filings with the Canadian securities regulatory authorities, press releases and

other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Namaste securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Namaste's undisclosed related party transaction.

120. By virtue of their positions at Namaste, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

121. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior officers and/or directors of Namaste, the Individual Defendants had knowledge of the details of Namaste's internal affairs.

122. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Namaste. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Namaste

businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Namaste securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Namaste's undisclosed related party transaction which was concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Namaste securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

123. During the Class Period, Namaste securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Namaste securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Namaste securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Namaste securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

124. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresentations to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

126. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127. During the Class Period, the Individual Defendants participated in the operation and management of Namaste, and conducted and participated, directly and indirectly, in the conduct of Namaste business affairs. Because of their senior positions, they knew the adverse non-public information about Namaste misstatement of income and expenses and false financial statements.

128. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Namaste financial condition and results of operations, and to correct promptly any public statements issued by Namaste which had become materially false or misleading.

129. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Namaste disseminated in the marketplace during the Class Period concerning Namaste results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Namaste to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling

persons" of Namaste within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Namaste securities.

130. Each of the Individual Defendants, therefore, acted as a controlling person of Namaste. By reason of their senior management positions and/or being directors of Namaste, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Namaste to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Namaste and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

131. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Namaste.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: April 5, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brenda Szydlo*
Jeremy A. Lieberman
Brenda Szydlo
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
bszydlo@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Brenda Szydlo*
Brenda Szydlo